Lesley E. Weaver (State Bar Number 191305)
lweaver@blockesq.com
BLOCK & LEVITON LLP
492 9th Street, Suite 260
Oakland, CA 94607
(415) 968-8999
(617) 507-6020

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELODIE ALLEY, JAQUATTA BECOATS, LAURA BROOKSBANK, RHONDA CARTER, DAWN HOMAN, KYLE HUESER, JAN JOHNSON, TINA MIRANDA, BROOKE SALISBURY, LUANNE STRICKLAND, KIM SELLER, SIDNEY STEEN and CHRISTINE TETI, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| COOPER VISION, INC., ALCON LABORATORIES, INC., BAUSCH + LOMB, JOHNSON & JOHNSON VISION CARE, INC., and ABB OPTICAL GROUP, | |
| Defendants. | |

Plaintiffs Melodie Alley, Jaquatta Becoats, Laura Brooksbank, Rhonda Carter, Dawn Homan, Kyle Hueser, Jan Johnson, Tina Miranda, Brooke Salisbury, Luanne Strickland, Kim Seller, Sidney Steen and Christine Teti ("Plaintiffs"), by and through their attorney, bring this Class Action Complaint ("Complaint") for purchasers of certain contact lenses manufactured by Cooper Vision, Inc. ("Cooper"), Alcon Laboratories, Inc. ("Alcon"), Bausch + Lomb, Inc. ("B&L") and Johnson & Johnson Vision Care, Inc. ("J&J") (collectively "Contact Lens Manufacturers") as described more fully below.

## NATURE OF THE ACTION

1.      Pursuant to federal and state law, only Eye Care Professionals ("ECPs") may charge consumers a fee for conducting eye examinations and determining prescriptions to remedy vision problems. ECPs are typically optometrists and ophthalmologists.

2.      In addition to conducting eye exams and writing prescriptions, many ECPs also serve as retailers for contact lens products, such as those produced by the Contact Lens Manufacturers.

3.      ECPs write prescriptions for specific products by manufacturer, for example J&J's Acuvue Moist. Unlike with pharmaceutical drugs, consumers cannot substitute one brand of contacts for a generic one, or for an alternative brand.

4.      The purchase of contact lens products is unbundled from the purchase of eye examinations from the ECPs. In fact, pursuant to the Fairness to Contact Lens Consumers Act ("FCLCA"), 1117 Stat. 2024 (2003), ECPs cannot require a consumer to purchase contact lenses from them in order for that consumer to receive a copy of their prescription.

5.      Thus, a consumer may purchase an eye examination from an ECP, then proceed to purchase contact lenses from discount retailers, such as 1-800-Contacts or Costco.

6.      Since they deal in volume and for other reasons, these discount retailers are able to individually negotiate discount prices from manufactures such as J&J, which are then passed along to consumers. Discount retailers are thus able to offer cheaper contact lenses to the public than the ECPs.

7.      The present conduct is not the first instance of collusion in the contact lens market. In 1996, Attorneys General from 34 states and a national class of consumers instituted an action, captioned *In re: Disposable Contact Lens Antitrust Litigation*, MDL 10130 (M.D. Fla.), against the major contact lens manufacturers, including Defendants and/or their predecessors in interest, and the American Optometric Association for conspiring to impede competition from discount retailers.

8.     In 2001, the parties reached a consent agreement, pursuant to which the manufacturers, including the Contact Lens Manufacturers and/or their predecessors in interest, agreed to cease their restrictive distribution policies. This consent agreement has now expired.

9.     Congress passed the FCLCA in 2003 to protect consumers and give them a choice to purchase contact lenses from someone other than an ECP.

10.    Since at least 2004 the Contact Lens Manufacturers cooperated with discount retailers resulting in lowered prices to consumers. Prior to approximately mid-2013, the Contact Lens Manufacturers allowed retailers to determine the prices at which they would sell contact lenses.

11.    In approximately mid-2013, the Contact Lens Manufacturers began to establish Minimum Retail Price Maintenance ("MRPM") policies. The MRPM policies prohibit any retailer of contact lenses governed by the MRPM policy from selling lenses below a set price, and were designed to bring the prices of discount retailers, such as 1-800-Contacts, in line with those charged by the ECPs.

12.    Discount retailers were required to and did begin to raise their prices to correspond to the MRPM strictures.

13.    The new MRPM policy came about through a conspiracy between Defendant ABB Optical Group ("ABB"), the Contact Lens Manufacturers, and the ECPs.

14.    The ECPs served as the contact lens marketplace's gatekeepers. Since the ECP's have the power to prescribe one set of lenses over another set of lenses, and no generic or substitution lenses are available, the Contact Lens Manufacturers have every incentive to conspire with the ECPs and to protect their profit margins; as noted above the Contact Lens Manufacturers have conspired before to insulate the ECPs from competition from larger distributors.

15.    ABB buys contact lenses from the four Contact Lens Manufacturers. ABB then resells these contact lenses to the ECPs. As stated on ABB's website, "ABB OPTICAL GROUP is the nation's largest distributor of soft contact lenses.  We supply more than two thirds of eye care professionals in America with brand-name contact lens; high-grade ophthalmic and fully

customizable gas permeable lenses." ABB's primary customer base consists of the independent ECP's as opposed to those ECPs employed by chain optical stores.

16.     ABB serves as the ECPs' mother hen; Angel Alvarez, ABB's CEO claims that his company is a "category captain" for ECP's and that ABB's task is "helping them manage that [contact lens] portion of their business....We take very seriously the trust that they have [in ABB]."

17.     In addition to helping its ECP customers, ABB itself directly benefited from the MRPM policy. Since the MRPM policies dictate that consumers will have to pay a similar price whether they purchase from ECP or a discount retailer, more consumers will purchase from an ECP, who will in turn purchase more contact lenses from ABB.

18.     The MPRM policy was enacted by the Contact Lens Manufacturers after significant consultation and cooperation with both the ECPs and ABB. The goal of the MRPM policy is simple: force discount retailers such as Costco or Wal-Mart out of the contact lens distribution marketplace, and eliminate competition.

19.     As Laura Angelini, President of J&J Vision Care – North America, explained to VMail, an optometrist industry newsletter, the MRPM policy "gives the optometrist the ability to improve his or her capture rate in the office. Now the patient has no incentive to shop around."

20.     Defendants' conspiracy has caused Plaintiffs and the class members collectively to pay millions of dollars more for contact lenses than they would have otherwise paid.

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants violations of Section 1 of Sherman Act (15 U.S.C. § 1).

22.     This court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law and under 28 U.S.C § 1337 for federal antitrust claims in particular.

23.     The Court additionally has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

24. Under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d), this District has venue over the action, for Defendants resided, transacted business, were found, and/or had agents in this District, and this District was the situs of a substantial portion of the affected interstate trade and commerce discussed herein during the Class Period.

## INTRADISTRICT ASSIGNMENT

25. Intradistrict assignment to the San Francisco Division is appropriate. The practices at issue affect adversely contact lens customer who reside in that division. On March 2, 2015, Costco filed a related case against J&J concerning its use of MRPM agreements with respect to contact lenses. *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.* (No. 3:15-cv-00941 (N.D. Cal.)("Costco Action")

## INTERSTATE TRADE AND COMMERCE

26. Defendants' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in this District, as Defendants intended.

27. Defendants manufactured, distributed, and sold contact lenses in an uninterrupted and continuous flow of interstate commerce among the United States and its territories. Defendants' anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES

28. Plaintiff Melodie Alley is a resident of Utah. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

29. Plaintiff Jaquatta Becoats is a resident of Michigan. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

30. Plaintiff Laura Brooksbank is a resident of New York. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

31.     Plaintiff Rhonda Carter is a resident of Mississippi. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

32.     Plaintiff Dawn Homan is a resident of North Carolina. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

33.     Plaintiff Kyle Hueser is a resident of Iowa. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

34.     Plaintiff Jan Johnson is a resident of Nebraska. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

35.     Plaintiff Tina Miranda is a resident of Minnesota. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

36.     Plaintiff Brooke Salisbury is a resident of West Virginia. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

37.     Plaintiff Luanne Strickland is a resident of Alabama. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

38.     Plaintiff Kim Seller is a resident of Wisconsin. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

39.     Plaintiff Sidney Steen is a resident of Oregon. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

40.     Plaintiff Christine Teti is a resident of Nevada. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to an RPM agreement, and which were manufactured by Defendants.

41.     Defendant Cooper is a United States company headquartered in Pleasanton, California. Defendant Cooper makes eye care products, including contact lenses.

42.     Defendant Alcon is a United States company headquartered in Fort Worth, Texas that is owned by Novartis. Alcon makes eye care products, including contact lenses.

43.     Defendant B&L is a United States company headquartered in Bridgewater, New Jersey. B&L is a wholly owned subsidiary of Valeant Pharmaceuticals, Inc. B&L makes eye care products, including contact lenses.

44.     Defendant J&J is a United States company headquartered in Jacksonville, Florida. J&J is a wholly owned subsidiary of Johnson & Johnson, Inc. J&J makes eye care products, including contact lenses.

45.     Defendant ABB is a United States company headquartered in Coral Springs, Florida. ABB wholesales the contact lenses manufactured by the Contact Lens Manufacturers, and provides them to more than two-thirds of the ECPs.

46.     Various persons that are not named as Defendants herein are believed to have participated in the violations alleged and in furtherance thereof to have performed certain acts. Plaintiffs reserve the right to name some or all of these persons as defendants in the future. There are a finite number of co-conspirators and plaintiffs believe that their identities are identifiable through Defendants' own records.

## **CLASS ACTION ALLEGATIONS**

47.     Plaintiffs bring this action pursuant to Rules 23(a), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Class") consisting of:

> All persons or entities who, from June 1, 2013 to the present, purchased disposable contact lenses manufactured by Defendants Cooper, Alcon, B&L, and/or J&J, their subsidiaries, affiliates, or joint-ventures for end use and not for resale, where the prices for such contact lenses were set pursuant to a "unilateral pricing policy" as described herein, or its equivalent. Excluded from the Class are: Defendants; the officers, directors, or employees of any Defendant; the legal representatives and heirs or assigns of any Defendant; and any co-conspirators. Also excluded are any federal entities, any judicial officer presiding over this action, and the member of

his or her immediate judicial staff, and any juror assigned to this action.

48.     Plaintiffs are unsure of the exact number of persons comprising the class and subclasses, but given the prevalence of contact lenses sold both nationwide, believe that the number of Class members and subclass members is in the hundreds of thousands, if not millions. Regardless, joinder of all members of the putative Class is impracticable.

49.     Plaintiffs' claims are typical of the claims of the Class and subclasses in that Plaintiffs purchased contact lenses subject to a Contact Lens Manufacturer's MRPM agreement. As alleged herein, all class members were damaged by the identical wrongful conduct.

50.     Numerous questions of law or fact arise from Defendants' unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts, that are common to the Class and subclasses, including but not limited to:

- Whether the Defendants formed and operated an agreement, combination, and/or conspiracy to fix, raise, maintain, or stabilize the prices of contact lenses sold in the United States;
- The operative time period and extent of these arrangements;
- Whether each Defendant was a participant in any such agreement, combination, or conspiracy;
- Whether the actions of Defendants in so doing violated Section 1 of the Sherman Act and the applicable state laws, discussed below;
- Whether the actions of the Defendants violated the various state laws asserted below;
- Whether the Defendants' conduct has had the effect of artificially fixing, stabilizing, maintaining, or stabilizing the price of contact lenses sold in the United States during the Class Period;
- Whether the conduct of the Defendants caused injury to business or property of Plaintiffs and the members of the Classes;
- The appropriate nature of Class-wide equitable relief; and

51.     These common questions of law and fact predominate over any questions affecting only individual class members.

52.     Plaintiffs will fairly and adequately represent the interests of the Class and subclasses, in that they have no conflict with any other members of the Class. Plaintiffs have retained competent counsel experienced in litigation of this type.

53.     Injunctive relief is appropriate in that Defendants have acted on grounds generally applicable to the Class as a whole.

54. A class action is superior to the other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Class and subclasses. The injury suffered by each individual member of the Class and subclasses is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' misconduct. It would be virtually impossible for individual members of the Class to redress effectively the wrongs done to them. Even if members of the Class could afford such individualized litigation, the court system could not. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties, and to the court system, due to the complex legal and factual issues presented by this dispute. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants' Antitrust History

55. Contact lenses first became widely commercially available in the 1940s. Typically made of glass and plastic, the first few generations of contact lenses were expensive and required extensive work on the part of an ECP to fit the lens to the customer's eye. As a result, customers purchased their lenses from ECPs.

56. Beginning in the early 1990s, contact lenses became stabilized, such that the same type of lens could be prescribed to multiple customers. For example, customers with astigmatism typically will receive a standard toric lens.

57. Following an eye exam, an ECP will write a prescription for a product from a certain manufacturer. Unlike pharmaceuticals, generic contact lenses do not exist, and a customer receiving a prescription for Alcon's AquaComfort Plus Multifocal cannot substitute a product manufactured by Cooper.

58.     Incentives exist at the outset for the ECPs to maximize their profit; since ECPs also supply contact lenses, they are incentivized to prescribe to their patients the lenses on which they make the most profit.

59.     Between the 1990s and December 2003, ECPs were not required to provide prescriptions to customers who sought to purchase their contact lenses from a retailer other than the ECP.

60.     In the late 1990s, Attorneys General from 32 states and a national class of consumers filed suit against the American Optometric Association and the Defendants (or their predecessors), for conspiring with retailers and each other to restrain competition. *In re: Disposable Contact Lens Antitrust Litigation* alleged that the ECPs, through the American Optometric Association, conspired to boycott manufacturers who would not agree not to sell their product to discounters. The ECPs' goal was to retain for themselves the lucrative practice of supplying contact lenses to consumers.

61.     A consent agreement was eventually reached. The manufacturers agreed not to put in place any restrictive distribution policies, and the ECPs agreed not to refuse to cooperate in allowing customers to fill prescriptions from other retailers.

62.     In December 2003, Congress reinforced the consent agreement by passing the FCLCA, which unbundled the purchase of an eye exam from the purchase of contact lenses. The legislative history of the FCLCA states that it was designed to "promote[] competition, consumer choice, and lower prices by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice." Henceforth, consumers would be allowed to shop around for the best prices for contact lenses.

**B.  The Contact Lens Marketplace**

63.     The marketplace for contact lenses is highly concentrated. According to Congressional testimony by R. Joe Zeidner ("Zeidner"), formerly the General Counsel of 1-800-Contacts, J&J controls 35.3% of the market, Alcon controls 30.6%, Cooper controls 23.9%, and

B&L controls 7.2%. The small remainder of the market is comprised of niche products, or products designed to treat specific and rarer eye disorders.

64. Large scale discount retailers, such as Costco or Wal-Mart purchase their product from the Contact Lens Manufacturers directly, and then sell to the consumer.

65. The ECPs, generally purchase from a middleman, the largest of which is ABB, and then sell to the consumer.

66. There exist high barriers of entry to the contact lens marketplace. A new entrant would need to develop manufacturing capabilities and seek approval from the FDA for any of its products.

67. The relevant product market is the market for soft (disposable) contact lenses, and the relevant geographic market is the United States, given the regulatory strictures that govern the sales of contact lenses in the United States. The FTC has twice, in 2004 and 2005, denominated this geographic market and product market as distinct.

## C. The Contact Lens Manufacturers Implement MPRM

68. Beginning in 2013, the Contact Lens Manufacturers once again began to engage in restrictive distribution policies, and started to adopt MRPM policies.

69. Alcon announced in June 2013 that it was instituting a MRPM policy on its Dailies Total1 branded product, requiring all dispensers not to charge below a minimum price for Dailies Total1, and threatening a one-year suspension for any dispenser who violated the Alcon MRPM policy. Alcon later expanded the policy to cover its AquaComfort Plus Multifocal, Toric, and Optix Colors lenses.

70. Before it instituted its MPRP policy, Alcon representatives consulted with various ECPs to ensure that they understood and agreed with the policy.

71. In 2014, B&L announced a MRPM policy for its ULTRA lenses. That same year Sauflon Pharmaceuticals, now owned by Cooper Vision, announced an MRPM policy for its CLARITI family of lenses.

72. In June 2014, in response to pressure by ECPs, J&J announced that it would be introducing a MRPM policy "[t]o further demonstrate [its] commitment to prescribers." Effective

July, 2014, J&J put in place a minimum price for a majority of J&J's existing contact lens products, stated that it would discontinue product lines not subject to its MRPM policy, and would institute a proactive minimum price for any future J&J contact lens product.

**D. The Contact Lens Manufacturers' Collusion with ABB and the ECPs**

73.     Each of the Contact Lens Manufacturers termed their new policies establishing a minimum price a "Unilateral Pricing Policy," but in reality, the policies were developed in close collaboration with each other, ABB, and the ECPs.

74.     Robert Atkinson ("Atkinson,"), President of the Information Technology and Innovation Foundation, testified at length on the collusion between the Contact Lens Manufacturers and ECPs in a submission to the U.S. Senate Committee on Judiciary, Subcommittee on Antitrust, Competition Policy, and Consumer Rights. Said Atkinson:

> In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's collusion all the same. In this case, it's professional collusion through norms that is leading producers to adopt UPP policies. In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social media channels that send a clear message to optometrists that they should prescribe doctors'-only lenses. For example, in an article in *Review of Cornea and Contact Lens* Gary Gerber, OD, writes:
>
> > One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; *volume discounts for large practices and online retailers go away*. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office - if all retailers sell the lenses for the same price, the method and environment under which they are sold will be the factors that determine where a patient decides to purchase their lenses.
>
> He goes to in essence to say, with UPP, optometrists will prescribe the UPP lens:
>
> > Manufacturers also benefit from UPP because retail price erosion can be stopped. With a race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity…. All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses. For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option.
>
> Finally, he states what is obvious to everyone in the industry - Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This

has afforded higher profit margins and created a new sense of excitement surrounding contact lenses. Likewise, in an article in *Review of Optometric Business*, Paul Karpecki, OD, FAAO writes in favor of UPP, stating - One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator.

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook," a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic, "J&J goes to universal pricing" writes with regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L, Alcon, and now J&J. Cooper next." In other words he is saying with UPPs competitors like 1-800 Contacts that sell for less will go out of business. And he is not so subtly encouraging CooperVision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to J&J adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon.[1]" In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is implying that if CooperVision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would they suddenly raise their prices to what I'm selling them."

And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd, writes, —At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP…. I think B&L will gain far more than they lose in practioner [sic] loyalty and support of this policy.

75. ABB facilitated this collusion between the Contact Lens Manufacturers and the ECPs. As Angel Alvarez, ABB's chief executive officer and founder stated, "ABB has been working closely with manufacturers to develop unilateral pricing policies..." Alvarez defended the MRPM policies by incorrectly assert that they "enable a better overall patient experience by supporting competiveness of prescribing practitioners. Contact lens fitters have always been and will always be a focus of our organization. We do everything possible to help them succeed."

76. ABB also served as the conduit for ECPs to communicate pricing information to each other. ABB provided its customers with a *Retail Price Monitor* and *Soft Lens Retail Price Matrix*, that showed the prices that ECPs nationwide were charging their customers. Not only did

---

[1] Cooper subsequently got "on board."

this allow the ECPs and the Contact Lens Manufacturers to monitor compliance with the pricing policy, it also allowed ECPs to increase prices above the pricing policy's minimums. As the ABB publication *Profit Advisor* explained, "Remember that UPP specifies the lowest price at which a particular lens can be sold. Can you sell it for more? Indeed, yes, and I encourage you to do so…. See the *Soft Lens Price Matrix* for a retail pricing strategy on the UPP product."

77.     ABB actively encouraged ECPs to gouge their customers. *Profit Advisor* told the ECPs "I encourage you to adopt a policy of saying that you'll match any legitimate price on these contact lenses. You already know what the price is; it's the UPP price. It won't hurt your bottom line to match the UPP for annual supplies and for the small percentage of customers who call upon you to do so."

78.     Similarly, the manufacturers also conspired with the ECMs in the institution of the new pricing policies. As stated previously, ABB represented that it was working "closely with manufacturers to develop unilateral pricing policies." Cooper advised that its decision to impose a UPP took place after receiving feedback from ECPs. Similarly, J&J noted that ECPs were "instrumental" in formulating its UPP.

79.     The Contact Lens Manufacturers acted in concert to adopt the MRPM policies because if one or more of the Contact Lens Manufacturers did not adopt such a policy, they stood at risk of the ECPs not prescribing their lenses.

80.     The four Contact Lens Manufacturers were the only members of a group known as the Contact Lens Institute ("Institute"), which gave them ample opportunity to conspire together to impose the UPPs. The Institute's Board is comprised of one executive from each of the Contact Lens Manufacturers, and contemporaneously with the adoption of the UPPs, the Institute established a committee "to develop a collaborative approach by the member companies to help inspire ECPs and their staff to proactively pursue opportunities to fit [contact lenses] and appropriately follow up so that their patients and practice will benefit."

81.     The Contact Lens Manufacturers were able to monitor the compliance of their competitors with the Contact Lens Manufacturers through a company called Veris Consulting. Veris Consulting is a provider of market data and granular sales information from each of the

Contact Lens Manufacturers directly from the Contact Lens Manufacturers' finance departments. Veris then shares this information with the other Contact Lens Manufacturers on a quarterly and annual basis.

### E. Competitive Harm

82. The institution of MRPM policies on the contact lens marketplace has already caused competitive harm. During the hearing before the Utah Senate Business & Labor Committee on February 17, 2015, Jay Magure, 1-800-Contacts' Vice President of Government Affairs testified that because of J&J's adoption of the UPP policy, 1-800-Contacts had to raise prices on the vast majority of its J&J contact lenses. As an example, in January 2014, a 90 lens box of J&J Acuvue Moist contact lenses sold for about $57.49, but in January 2014 it sold for $63.74.

83. 1-800-Contacts also conducted a survey of some 780 doctors. This survey revealed that prices of J&J contact lenses subject to J&J's new policy increased 57%.

84. StopUpp, a website dedicated to combating the MRPM policies, published this comparison of J&J's December 2013 prices which its current prices.

| Manufacturer | Contact Lens | Old Price* | UPP Price | Change |
|---|---|---|---|---|
| Johnson-Johnson | 1-DAY ACUVUE MOIST (30 lenses) | $13.80 | $33 | +139% |
| Johnson-Johnson | 1-DAY ACUVUE MOIST (90 lenses) | $36.49 | $63.50 | +74% |
| Johnson-Johnson | 1-DAY ACUVUE MOIST for ASTIGMATISM (30 lenses) | $18.24 | $34.50 | +89% |
| Johnson-Johnson | 1-DAY ACUVUE TRUEYE (90 lenses) | $47.74 | $82.50 | +73% |
| Johnson-Johnson | ACUVUE OASYS with HYDRACLEAR PLUS (12 lenses) | $22.68** | $67.50 | +198% |
| Johnson-Johnson | ACUVUE OASYS with HYDRACLEAR PLUS (24 lenses) | $44.23 | $110 | +149% |
| Johnson-Johnson | ACUVUE OASYS for ASTIGMATISM (6 lenses) | $21.74 | $40 | +84% |
| Johnson-Johnson | ACUVUE OASYS for PRESBYOPIA (6 lenses) | $22.96 | $40 | +74% |

* Lowest online price after applying coupons and mail-in rebates, Dec 2013. Source: www.lensbob.com
** Based on price of two 6pk boxes. 12pk boxes were not available prior to J&J's Unilateral Pricing Policy.

85. At the hearing before the U.S. Senate Committee on Judiciary, Subcommittee on Antitrust, Competition Policy, and Consumer Rights, Zeidner provided the following chart, demonstrating the increase in prices as of July 2014:



86.     At discount retailer Costco, prices for Alcon's Dailies Total1 contact lenses increased from $85.00 to $95.00 following the imposition of MRPM.

87.     Meijer's, another discount retailer, explained that the Contact Lens Manufacturers' UPP policy required it to raise prices on all the lenses it carries:

> The manufacturers state that they have instituted the UPP for their customers however, the adoption of the UPP essentially prevents marketplace competition. ***This eliminates your ability to shop around for the best price on these contact lens brands***, as well as our ability to offer relief….The manufacturers have created a "floor" or a "minimum" price that the lenses may not be priced below. Our prices had been lower than that "minimum" prior to this change in policy. ***The UPP has caused us to raise our prices on these contact lens brands*** in order to remain in compliance with this policy.

Emphasis added

## F.  Enforcing the MRPM

88.     Each of the Contact Lens Manufacturers has put in place draconian measures to prevent distributors from selling below the MRPM.

89.     Alcon explained its process at a Senate hearing stating... "Alcon chose to create an environment in which ECP's might more likely spend time learning about the new technology and

explaining it to patients, all why having the opportunity to make a reasonable profit margin. It did so by adopting its unilateral pricing policy, or UDP, when it launched DAILIES TOTAL1 in 2013. That policy provided that Alcon would not supply DAILIES TOTAL1 to customers who resold it for less price announced by Alcon.

90.     Alcon customers are warned the first time there found to be selling below the MRPM, and given an opportunity to cure. After a violation of Alcon's policies is confirmed by a third-party auditor, the retailer is advised that they need to "make a correction" within five days. Only if the violator refuses to increase its price does Alcon institute a product denial, thus cajoling distributors to abide by its policies.

91.     When B+L announced its UPP, it told its customers "[E]ach customer is free to advertise or charge whatever price it wants, but you understand that Bausch + Lomb will cease to supply, and will prohibit its authorized dealers from supplying, Bausch + Lomb Ultra contact lenses to any customer that resells or advertises Bausch + Lomb Ultra contact lenses to the end consumer (*e.g.* patient) for sale at less than the MRP."

92.     Dr. Millicent Knight, J&J's head of Professional Affairs, explained that "Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices. The first of these firms monitors all on-line pricing and advertising, the second conducts in-store price validation nationwide. All customer types, regardless of size, geography, distribution method, etc. are included in one or more of these monitoring efforts. If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer."

93.     In a November 5, 2014 circular J&J advised its customers "[i]f you sell product below the UPP price, [J&J] and its authorized distributors will refuse to accept new orders from you. In addition, [J&J] will exercise its right to repurchase your current inventory of products subject to the UPP price."

## LEGAL STANDARD

94.     Plaintiffs herein allege that the Contact Lens Manufacturers have entered into a horizontal conspiracy between themselves, ABB, and the ECPs, a *per se* illegal agreement in restraint of trade.

95.     In addition, the Contact Lens Manufacturers have engaged in a vertical conspiracy to establish MRPM policies. Plaintiffs allege that under the United States Supreme Court precedent in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) vertical MRPM policies are to be examined under a rule of reason standard.

96.     In *Leegin*, the Court identified three factors to determine whether a MRPM is unreasonable, to wit: (a) whether several competing manufacturers adopt RPM programs; (b) whether retailers play a role in instigating RPM programs; and (c) whether manufactures or retailers have market power. *Id.* at 897-98.

97.     The first *Leegin* factor is satisfied here. As described herein, the four leading manufacturers of contact lenses all adopted MRPM policies.

98.     The second *Leegin* factor is also satisfied. ABB and the ECPs played a significant role in the development of the MRPM policies for all four manufactures. J&J has represented that ABB and the ECPs were "instrumental in the development of the policies," and ABB's Chief Executive Officer stated, "ABB has been working closely with manufacturers to develop unilateral pricing policies."

99.     Plaintiff has also alleged facts sufficient to meet the third *Leegin* factor. As noted above, the four manufacturers comprise approximately 97% of the market.

100.    There are no pro-competitive justifications for the MRPM policies. These policies do not prevent free-riding, because the customer already compensates the ECP for an eye exam even if the patient does not purchase contact lenses from the ECP. Nor is there any risk of patient harm, customers have been purchasing contact lenses from discount distributors for nearly a decade, without anything approaching a harm that would justify the imposition of the MRPM policies. There exist no free-riding concerns, since the discount contact lens retailers are not in the business of providing eye-exams, and the ECPs are compensated for providing eye exams.

## COUNT ONE
## <u>VIOLATION OF SECTION ONE OF THE SHERMAN ACT</u>

101.    Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

102.    Commencing in June 2013 and continuing through to the present, Defendants have engaged in a conspiracy and agreement in unreasonable restraint of trade, violating Section 1 of the Sherman Act. The Contact Lens Manufacturers implemented MRPM policies in concert with each other, with the ECPs, and with the assistance and connivance of ABB. The Contact Lens Manufacturers agreed, at least tacitly, to start using MRPM policies, recognizing that such policies could only be effective if universally employed.

103.    Defendants' horizontal conduct is a *per se* violation of Section 1 of the Sherman Act. Thus no allegations with respect to the relevant product market, geographic market, or market power are required.

104.    As a direct result of the Defendants' unlawful conduct prices for disposable contact lenses were raised, fixed, maintained, and stabilized in the United States.

105.    As a direct result of the Defendants' unlawful conduct, Plaintiffs and the other members of the class have been injured in their business and property in that they had paid more for contact lenses than they otherwise would have paid in the absence of such conduct.

106.    With respect to their claim under the Sherman Act, Plaintiffs seek and are entitled to treble damages, attorneys' fees and costs.

## <u>DEMAND FOR JURY TRIAL</u>

107.    Pursuant to Federal Rule of Civil Procedure 38(b), each Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, and for the foregoing reasons, Plaintiffs pray this Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

a. This action may proceed as a class action pursuant to Rule 23(b)(3), with Plaintiffs designated the Class representative, as described above, and their chosen counsel designated Class Counsel;

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and applicable state laws described herein;

c. That judgment be entered for Plaintiffs on their claim for damages, trebled as allowed by law;

d. That Plaintiffs and the members of the Class recover pre-judgment and post-judgment interest as permitted by law;

e. That the Contact Lens Manufacturers, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf be permanently enjoined from maintaining the competition, conspiracy, or agreement described herein;

f. That Plaintiffs and the members of the Class recover their costs of the suit, including attorneys' fees and expert fees, as provided by law;

g. Such other and further relief as this court deems just and proper under the circumstances.

CLASS ACTION COMPLAINT

Dated:  April 10, 2015                                    BLOCK & LEVITON LLP


By: /s/ Lesley E Weaver
LESLEY E. WEAVER
(State Bar No. 191305)
492 9th Street, Suite 260
Oakland, CA 94607
Telephone: (415) 968-8999
Facsimile:  (617) 507-6020
lweaver@blockesq.com


Peter Safirstein
Roger A. Sachar Jr.
Morgan & Morgan
28 West 44th Street
Suite 2001
New York, NY  10036
Phone: (212) 564-1637
Facsimile: (212) 564-1656
PSafirstein@MorganSecuritiesLaw.com
RSachar@MorganSecuritiesLaw.com

*Counsel for Plaintiffs*

CLASS ACTION COMPLAINT